# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSE TRUJILLO, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 07 C 4946 |
| APPLE COMPUTER, INC. and AT&T MOBILITY LLC, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Jose Trujillo has sued AT&T Mobility LLC (ATTM)[1] and Apple Computer, Inc. (Apple). His lawsuit concerns an iPhone that he purchased at an Apple retail store in Oak Brook, Illinois in early July 2007 and then gave to Dawn Trujillo as a gift.

ATTM is the exclusive provider of wireless service for the iPhone. A person who signs up with ATTM for iPhone service must do so for a minimum of two years. The iPhone's battery, however, may not last that long; even though it is rechargeable, it must be replaced after about 300 charges. To replace the battery, the iPhone user must send the device to Apple, incurring a $79 service fee plus shipping charges and

---

[1] In his original complaint filed in state court, Trujillo named AT&T Inc. as a defendant. In his amended complaint, filed after Apple removed the case to federal court, Trujillo substituted AT&T Mobility LLC. The Court made an inquiry regarding AT&T Mobility's citizenship and has determined, based on the results of that inquiry, that the minimal-diversity requirement of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), is met and that no grounds for abstention under that statute exist.

an additional fee for the use of a loaner iPhone in the interim. The only alternative for the user is to cancel his service with ATTM before the end of the two year term, which results in a significant early termination fee.

Trujillo contends that in marketing and promoting the iPhone before it was launched for sale, both Apple and ATTM hid information about the limited life of the battery and what is required to replace it, thus misleading consumers about the true cost of the iPhone. He has sued both companies for fraud, breach of contract, breach of implied warranty, unjust enrichment, and violation of the Illinois Consumer Fraud Act.

ATTM has moved to compel arbitration; it argues that pursuant to its service contract with Trujillo, his claims against ATTM must be submitted to arbitration on an individual basis. The Court denies ATTM's motion. The agreement that ATTM contends requires arbitration of Trujillo's claims was not available to Trujillo before or when he purchased the iPhone – a factor that, under Illinois law, is critical to enforceability.

**Facts**

**1.     Outline of Trujillo's claims**

The iPhone is a combined wireless telephone and internet access device, manufactured by Apple. Both Apple and ATTM (known until January 2007 as Cingular Wireless) sold the iPhone at their respective retail stores at the relevant time. ATTM is the sole licensed provider of wireless service for the iPhone. When a prospective iPhone user contracts for service with ATTM, he must sign up for a minimum of two years.

Trujillo's lawsuit concerns the durability of the iPhone's battery. After recharging the battery about 300 times, a user must send his iPhone to Apple for battery replacement. This typically occurs, Trujillo alleges, inside of two years after purchase. When the user send in the device for battery replacement, he incurs a $79 service fee plus shipping charges and an additional fee for the use of a loaner iPhone in the interim.

Trujillo alleges that given ATTM's two year minimum service term, the charges connected with battery replacement amount to "a de facto annual maintenance and/or service charge" worth nearly one-fifth of the iPhone's purchase price. Am. Compl. ¶ 22. He alleges that in marketing and promoting the iPhone, both Apple and ATTM hid information about the iPhone battery's limited life and the details of Apple's battery replacement program until after the device was launched for sale to the public. This, Trujillo alleges, misled consumers about the "true nature of the iPhone and its actual expense." Am. Compl. ¶ 31. Trujillo asserts claims of common law fraud, breach of contract, implied warranty, and unjust enrichment, and violation of the Illinois Consumer Fraud Act.

The facts relevant to ATTM's motion to compel arbitration have emerged slowly. After the Court questioned the foundation for certain of ATTM's contentions, ATTM submitted supplemental materials. Those materials revealed that ATTM's initial factual submission had been false in several material respects. The Court will lay out these circumstances in some detail as it reviews the relevant facts.

**2.      Trujillo's purchase of an iPhone**

As noted at the outset of this decision, Trujillo's claims concern an iPhone that

he purchased.  *See* Am. Compl. ¶ 8.  Trujillo purchased an iPhone from an Apple retail store in Oak Brook, Illinois on July 2, 2007.  He paid $533.93 – $499.00 plus sales tax of $34.93.  The sales receipt from the Apple store, which Trujillo provided as part of a supplement to his response to ATTM's motion to compel arbitration, stated that he could return the iPhone by July 16, 2007 but would be charged a "$49.90 fee if opened," i.e., if the box in which the device was sold had already been opened.  Pl. Suppl. Resp. to Def. Mot. to Compel Arb., Ex. B.

It appears Trujillo bought the iPhone as a gift for Dawn Trujillo, a non-party to this lawsuit.  Their exact relationship has not been addressed but is of no consequence to the current dispute.  ATTM's records show that Dawn Trujillo later activated that iPhone on her pre-existing account with ATTM.

### 3.     Availability of ATTM service terms to Trujillo in connection with his iPhone purchase

In its opening and reply briefs, ATTM argued that before Trujillo bought the iPhone, he had access, by two separate means, to ATTM's terms of service, which contains the arbitration provision that serves as the basis for its motion to compel Trujillo to arbitrate his claims.  ATTM also argued that Trujillo had the opportunity to read the terms of service in full when he initiated service for the iPhone with ATTM.  Thus, ATTM argued, Trujillo could not contend that ATTM's service agreement, including its arbitration requirement, was hidden or that he was unaware of it.

To support its argument, ATTM submitted with its opening brief an affidavit from an ATTM in-house attorney named Neal Berinhout.  Berinhout swore that he had personal knowledge of the facts stated in his affidavit.  Berinhout Affid. ¶ 2.  In his

affidavit, Berinhout stated that ATTM's records reflected that Trujillo had purchased an iPhone at a retail store on an unspecified date and then activated wireless service online on July 5, 2007.  *Id.* ¶ 7.

Berinhout stated that in the course of purchasing an iPhone from a retail store, "customers also receive an iPhone rate plan and a separate document summarizing the activation process, available rate plans, and the return policy."  *Id.* ¶ 8.  Berinhout included copies of these documents with his affidavit.  The document concerning the iPhone activation process states that wireless service for the device can be obtained only from ATTM and that a two-year service agreement is required.  *Id.*, Ex. B.  This same document also states that one activates the device online, via the Internet.  *Id.*  It also states, in bold print, that **"You can return your iPhone within 14 days for a full refund, but there is a 10% restocking fee if the box has been opened."**  *Id.*  The other document, identifying the rate plan, states that "[a]n early termination fee of $175 applies if service is terminated before the end of the contract term," which as noted earlier is two years.  *Id.*, Ex. A.  It states that this fee will be waived "[i]f [the] phone is returned within 14 days in like-new condition with all components" and that the "activation fee" of $36 would be refunded if the phone is returned within three days.  *Id.*  The rate plan states, however, that "[a]ll other charges apply" and that "[s]ome dealers impose additional fees."  *Id.*  The documents make no reference to the requirement of arbitration.

In his affidavit, Berinhout stated that "[t]he ATTM Terms of Service booklet, which contains the terms and conditions of wireless service" – including the arbitration

provision at issue in this case – is "available in the store and online by going to http://www.wireless.att.com and clicking on 'Wireless Service Agreement' at the bottom of the web page." *Id.* ¶ 9. Berinhout included with his affidavit a copy of the terms of service that he said were in effect "at the time that Mr. Trujillo purchased his iPhone . . . ." *Id.* ¶ 9 & Ex. C.

In his response to ATTM's motion, Trujillo raised no issue regarding the accuracy of Berinhout's affidavit. In reviewing the briefs, however, the Court became concerned about the evidentiary foundation for Berinhout's statements regarding Trujillo's claimed access to the ATTM terms of service before or when he purchased the iPhone. Those statements bore directly on the issue of procedural unconscionability, a centerpiece of Trujillo's attempt to avoid arbitration. The Court entered an order in which it said that it "[could not] imagine how [Berinhout,] an in-house lawyer from AT&T Mobility[,] possibly could have personal knowledge regarding whether a copy of [the] agreement was available in any given Apple store at a particular point in time" or even whether Apple had a habit or practice of keeping such documents in its stores. *Trujillo v. Apple Computer, Inc.*, No. 07 C 4946, 2008 WL 2787711, at *3 (N.D. Ill. Apr. 18, 2008). The Court's order also addressed other issues, including the accessibility and availability of the purported online version of ATTM's terms of service – which ATTM contended Trujillo could have found and examined before or contemporaneously with his iPhone purchase. The Court directed the parties to file supplemental submissions.

ATTM's supplemental submission filed pursuant to the Court's order established that Berinhout, contrary to his sworn statement, lacked personal knowledge regarding the availability of the terms of service to Trujillo before he bought the iPhone at issue in

6

this case.  ATTM's supplemental submission also established the falsity of Berinhout's earlier sworn statements that the terms of service booklet with the relevant arbitration provision was available in the store where Trujillo bought the iPhone and was also available online.

With its supplemental submission, ATTM submitted a new affidavit from Berinhout.  In that affidavit, Berinhout stated that contrary to his earlier sworn statement, he had "since been informed that the Apple store in Oak Brook, Illinois where plaintiff Jose Trujillo purchased his iPhone does not keep ATTM's Terms of Service Booklet in stock."  Berinhout 2d Suppl. Affid. ¶ 3.  Berinhout thereby conceded that his initial affidavit was false in two significant respects.  First, Trujillo did not, in fact, have access to a paper copy of the agreement before or when he bought the iPhone. Second, contrary to Berinhout's earlier sworn statement, he actually had lacked personal knowledge of what was and was not available at retail stores – in particular at Apple retail stores.

ATTM also included in its supplemental submission a footnote (!!) in which it stated, contrary to the clear import of Berinhout's initial affidavit, that a person who searched online for its terms of service as of July 2007 would not have found the version of those terms of service upon which ATTM premised its motion to compel arbitration.  *See* ATTM 2d Suppl. Brief (filed May 5, 2008) at 2 n.2, citing Harry Bennett Affid. ¶ 6.  This statement established the falsity of Berinhout's sworn statement that the agreement with the relevant arbitration provision had been available online.  ATTM attempted to dismiss this as inconsequential, on the ground that the obsolete terms of service that a searcher could have found still "would have placed the prospective

consumer on notice" of an arbitration requirement. *Id.* It is abundantly clear from ATTM's supplemental submissions, however, that contrary to its earlier statements to the Court, Trujillo had no access – none – to the purported contract upon which the obligation to arbitrate the dispute in this case is claimed to rest, either before or at the time he purchased the iPhone from the Apple store.

With its supplemental submission, ATTM also provided an affidavit from Harry Bennett, who is responsible for overseeing the business group that maintains ATTM's website. Bennett gave no indication that the web site contained any information that would direct a visitor to the terms of service. Rather, he stated that to find the terms of service on the website, one would have to use the "search" tool and type in an appropriate query, such as "terms of service," "agreement," or "conditions." Harry Bennett Affid. ¶ 6. Even then, as noted above, a visitor would have found terms of service that were already obsolete. Bennett's affidavit suggested that yet another statement in Berinhout's initial affidavit was false – namely his contention that as of the date Trujillo purchased his iPhone, ATTM's terms of service were readily available via a single click on a link clearly marked on the company's website.

**4.      Dawn Trujillo's purchase of an iPhone and its activation by Jose Trujillo**

Due to Berinhout's apparent 180-degree turn from the sworn statements in his original affidavit, the Court (at a hearing on May 8, 2008) directed ATTM to file additional papers explaining why Berinhout's story had changed. In response, ATTM made a further supplemental submission in which it contended that in making his first affidavit, Berinhout assumed Trujillo had bought his phone at an ATTM store because the company's records reflected that he received service on an iPhone purchase at an

ATTM store.  ATTM gave no real explanation for how it or Berinhout had managed, up until that point, to miss the fact that Trujillo had specifically stated in his complaint that he had purchased the iPhone *from an Apple retail store* and that the purchase receipt he had submitted in opposition to the motion to compel arbitration was *from an Apple store*.

ATTM stated in its new submission that it had investigated further and determined that the Apple store receipt that Trujillo had submitted "actually corresponds to an iPhone that was activated by . . . Dawn Marie Trujillo."  ATTM 3d Suppl. Brief at 3. It now appears, based on the more complete and accurate factual record currently before the Court, that Trujillo gave the iPhone that he purchased from the Apple store to Dawn Trujillo as a gift.  Dawn Trujillo then activated service for that iPhone online, via her preexisting ATTM account.  Diane Bonina, another ATTM in-house attorney, states in an affidavit attached to one of ATTM's supplemental submissions that Dawn Trujillo has been an ATTM customer since November 2005 and that with her December 2006 bill she received a copy of the terms of service that include the arbitration provision at issue in this case.  Bonina Affid. ¶¶ 16, 21-22.  (Dawn Trujillo is not, however, a plaintiff in this case.)

It appears that around the same time that Trujillo gave the iPhone he had purchased to Dawn Trujillo, she purchased an iPhone from an ATTM store and gave it to Trujillo as a gift.  It further appears that Trujillo then activated service for that iPhone online, in the process opening a new ATTM account for himself.  With its new submission, ATTM submitted an affidavit from Ramoncito Balce, the manager of an ATTM store in Elmhurst, Illinois.  Balce states that ATTM records reflect that Dawn

Trujillo came to the store on June 29, 2007, the first day iPhones were offered for sale, "in order to purchase an iPhone to use in connection with her preexisting ATTM account." Balce Affid. ¶ 3. The store had already sold all of its iPhones, so (according to records Balce reviewed) a cashier at the store arranged to have a phone shipped to Dawn Trujillo at her home. She paid for the device at the store that same day. *Id.*

According to Balce, ATTM records reflect that about one week later, Jose Trujillo activated the iPhone that Dawn Trujillo had purchased, *id.* ¶ 4 – which, the Court notes, is *not* the phone upon which Trujillo bases his claim in this case. Balce says that the company's records reflect that on July 5, 2007, an employee at the Elmhurst ATTM store created a tentative account number for Trujillo and ran a credit check on him, a step required when a new customer wishes to avoid paying a deposit before commencing service. *Id.* ¶¶ 6-7. According to Balce, "[i]t is store policy not to run a credit check for a customer unless the customer is present in the store." *Id.* ¶ 8. Balce says that the iPhone that Dawn Trujillo purchased was activated later on July 5, via an online transaction. *Id.* ¶ 9. About fifteen minutes after the activation, ATTM personnel were asked to change the phone number assigned to the iPhone. *Id.* ¶ 10. It is a reasonable inference from Balce's affidavit that Jose Trujillo went to the Elmhurst ATTM store on July 5, 2007 to have a credit check done so he could initiate service on the iPhone that Dawn Trujillo had given him. The Court also assumes for purposes of discussion that Trujillo activated that iPhone online himself; ATTM so argues, and Trujillo does not argue otherwise.

Balce says that the ATTM store he manages "keeps in stock whatever version of ATTM's Terms of Service booklet that is then in effect" and that "[c]opies of that booklet are available for customers to review and take with them." Balce Affid. ¶ 2. Neither Balce nor ATTM, however, provided the Court with any information about what Balce meant by "available" – specifically, *how* the terms of service were available at the store, or whether and how the booklet's availability was called to the attention of a customer who, like Trujillo, comes in to have a credit check done in order to set up service.

**5.      More regarding availability of ATTM service terms to Trujillo**

ATTM's additional supplemental submission contained yet another affidavit from Berinhout, who attempted to explain his earlier errors (as discussed above). In that affidavit, Berinhout conceded still more inaccuracies in his earlier submissions. As noted earlier, Berinhout's second supplemental affidavit (filed on May 5, 2008) included a sworn statement that contrary to his original sworn affidavit, he had "since been informed that the Apple store in Oak Brook, Illinois where plaintiff Jose Trujillo purchased his iPhone does not keep ATTM's Terms of Service booklet in stock." Berinhout 2d Suppl. Affid. ¶ 3. This statement suggested that the unavailability of the ATTM terms of service had simply been an oversight on the part of the Oak Brook Apple store. In his third supplemental affidavit (filed on May 19, 2008), however, Berinhout made it clear that there was more to it than that: "I have subsequently learned that there is not a joint Apple/ATTM policy requiring that ATTM's terms of service be available in Apple retail stores. . . . Thus, contrary to my original understanding, a customer who purchases an iPhone from an Apple retail store does not obtain ATTM's terms of service in the store." Berinhout 3d Suppl. Affid. ¶ 11. In

11

short, no one – not just Trujillo – who purchases an iPhone at an Apple store had access to the terms of service at that store.

In this same affidavit, Berinhout conceded two more significant inaccuracies in his original affidavit. First, he stated that in light of the fact that Trujillo purchased his iPhone in an Apple store, he (Berinhout) actually had no clue whether Trujillo would have received the ATTM rate plan and activation process documents referenced earlier. *Id.* ¶ 12. Second, Berinhout stated, in effect, that the statement in his first affidavit that the terms of service were available on ATTM's web site via a single click on a box entitled "Wireless Service Agreement" was literally true but nonetheless misleading: true because it actually described the state of affairs as of the date of the affidavit (October 2007), but misleading because that *was not* the state of affairs in July 2007, the relevant time for purposes of the present motion. Rather, that one-click reference was not added to ATTM's web site until September 2007. *Id.* Thus the aforementioned statement in Berinhout's first affidavit, included for the obvious purpose of convincing the Court of the ease of accessing the terms of service online, in fact amounted to misdirection.

**6.    Trujillo's activation of the iPhone he received as a gift**

As noted earlier, it appears that Trujillo performed the online transaction necessary to activate service on the iPhone that Dawn Trujillo gave him as a gift – which, the Court again notes, is not the iPhone on whose purchase Trujillo bases his claims in this case. To complete the online activation process, the customer must click on a box stating that  "I have read and agree to the AT&T Service Agreement."  The

text of that agreement is contained in a window immediately above the box.  The

agreement is relatively lengthy, and only a small portion of it can be viewed in the

window at any one time.  To view the entire agreement, the customer must scroll down

through the agreement.  The portion viewable when the agreement first appears

contains a paragraph stating the following: [2]

> PLEASE READ THIS SOFTWARE LICENSE AGREEMENT ("LICENSE") CAREFULLY BEFORE USING
> YOUR iPHONE, BY USING YOUR iPHONE, YOU ARE AGREEING TO BE BOUND BY THE TERMS
> OF THIS LICENSE.  IF YOU DO NOT AGREE TO THE TERMS OF THIS LICENSE, DO NOT USE THE
> iPHONE.  IF YOU DO NOT AGREE TO THE TERMS OF THE LICENSE, YOU MAY RETURN THE
> iPHONE TO THE PLACE WHERE YOU OBTAINED IT FOR A REFUND.

Berinhout 1st Affid., Ex. 4.  A bit further on, assuming the customer scrolls down

through the agreement, it states that "[b]y checking 'I have read and agree to the

service agreement', you will be bound to the following for the two-year term of the

agreement:  1)  the Terms of Service, including the binding arbitration clause . . . ." *Id.*

Contained in the agreement – about two-thirds of the way through, as best as the

Court can determine from what ATTM has provided – the arbitration provision appears.

It begins with a heading that reads, in bold print, **"DISPUTE RESOLUTION BY**

**BINDING ARBITRATION**."  *Id.*  In a summary of the provision, the agreement states

that if ATTM is unable to resolve a dispute to the customer's satisfaction, "we each

agree to resolve those disputes through binding arbitration or small claims court instead

of in courts of general jurisdiction" and that "[a]ny arbitration under this Agreement will

---

[2] The Court has adjusted the size of the typeface in the text above so that the text of the
quoted portion of the agreement includes the same number of words per line as the
opening portion of the agreement, a screen shot of which ATTM provided to the Court.
ATTM has not advised the Court regarding the actual size of the typeface, and in any
event what a particular customer sees likely would depend on the size of his computer
screen and the nature of his default settings.

take place on an individual basis; class arbitrations and class actions are not permitted." *Id.* These terms are repeated in more detail in the full text of the arbitration provision, which also contains other terms relating to expenses, cost-shifting, and the like. *Id.* The agreement also states that ATTM and the customer "agree to arbitrate **all disputes and claims between us.**" *Id.* (emphasis in original).

No ATTM affiant directly states that Trujillo, or for that matter anyone, checked the box stating that "I have read and agree to the AT&T Service Agreement." But as suggested above, one reasonably may infer that someone checked that box – Berinhout stated that if a customer does not check the box, he may not activate his iPhone, Berinhout 1st Affid. ¶ 10 – and that it was Trujillo who did so when the phone that Dawn Trujillo had given him was activated.

## Discussion

As noted earlier, Trujillo has asserted, against both ATTM and Apple, claims under the Illinois Consumer Fraud Act and for fraud, breach of contract, breach of implied warranty, and unjust enrichment. His complaint states that his claims concern the iPhone that he purchased from the Apple retail store – the one that he gave as a gift to Dawn Trujillo.

After Apple removed the case to federal court, ATTM moved to compel Trujillo to arbitrate his claims against ATTM and to dismiss those claims. (Apple has moved separately for summary judgment; the Court will address that motion in a separate order.) ATTM seeks to require Trujillo to arbitrate his claims as an individual and not on

behalf of a class, or to seek relief in small claims court, pursuant to the terms of the ATTM service agreement and the Federal Arbitration Act, 9 U.S.C. § 4.

Before reaching the merits of ATTM's motion to compel arbitration, the Court pauses to discuss further the disturbing events that caused the process of briefing and deciding the motion to be so elongated.

**1.      The Berinhout affidavits**

It is abundantly clear that Berinhout's initial affidavit was false in several material respects.  To catalog the misrepresentations:

-        Berinhout falsely stated under oath that he had "personal knowledge" of the facts in his first affidavit, including what documents customers who purchase iPhones receive, what documents are available in retail stores, and the online availability of the terms of service at issue in this case.  Via his later explanations of other misstatements, Berinhout has made it clear that the information he said he knew personally was, in fact, second- or third-hand information.

-        Berinhout stated under oath that an ATTM rate plan and activation directions were provided to a customer purchasing an iPhone at a retail store.  Now he says he has no idea whether this was so.

-        Berinhout swore, without qualification, that ATTM's terms of service were available to iPhone purchasers at retail stores.  Now he says that he actually has no idea whether the terms of service were available at the store where Trujillo purchased his iPhone. He also now says that there was no understanding between ATTM and Apple that the latter would have ATTM's service terms available at Apple stores.

- Berinhout said under oath that the agreement with the arbitration provision on which ATTM premises its motion to compel was available online at the time of Trujillo's purchase.  He now admits that this agreement was not available.

- Berinhout stated under oath that when Trujillo purchased his iPhone, the ATTM terms of service were available online in a quick and easy manner, via a clearly marked one-click reference on the company's website.  This, too, was untrue; in fact, the terms of service could be found only by performing a search using proper search terminology.

These statements were critical to ATTM's motion to compel arbitration.  A key thrust of Trujillo's opposition to arbitration was that the arbitration agreement was hidden from him prior to or at the time of his purchase of the iPhone.  To anticipate this contention, and later in response to it, ATTM attempted to convince the Court that Trujillo had ready access to the agreement in several different ways.  Had the Court simply relied on Berinhout's affidavit – as he and ATTM obviously intended – it would have decided the motion to compel arbitration based on false premises.

One might be tempted to chalk this up to a simple lack of foundation for Berinhout's original statements – in other words, to mere lack of direct knowledge.  That would be bad enough, but there is more to it than that.  Berinhout affirmatively misrepresented to the Court that the information in his affidavit was based on his personal knowledge.  In fact, it was – as Berinhout no doubt knew at the time – based on second- and third-hand information.  Berinhout may have had some direct knowledge about ATTM policy, but the aforementioned statements involved how things

actually happened in the field. The distinction between policy and execution had to have been obvious to Berinhout as a lawyer making statements under oath to a court. And it ought to have been equally obvious to the lawyers representing ATTM in this case.

Berinhout's explanation for why he – as opposed to someone who *actually* had personal knowledge – submitted the initial affidavit is just as troubling. Berinhout states that

> [i]n order to limit the costs and business disruptions that take place when ATTM responds to challenges to the arbitration agreements between ATTM and its customers, I decided to assume principal responsibility for attesting to various aspects of the formation and substance of these agreements. Accordingly, I served as the primary declarant in support of ATTM's motion to compel arbitration in this case.

Berinhout 3d Suppl. Aff. ¶ 5. Though this statement may explain Berinhout's role from a business standpoint, it displays a shocking disregard of the requirements of the rules of evidence. There is no such thing as a "primary declarant" entitled to present as personal knowledge information communicated to him by others – no matter what "costs" or "disruptions" are involved. *See* Fed. R. Evid. 602; *cf.* Fed. R. Civ. P. 56(e) (requiring personal knowledge of facts stated in affidavit submitted in connection with summary judgment motion). When an affiant – in particular, a lawyer – swears under oath that he has personal knowledge of the facts he cites, that tells the Court that he has first-hand information, not information collected by others behind the curtain and then communicated by the declarant.

One has the right to expect better, both from Berinhout, a lawyer acting as a witness before a court, and from the lawyers who presented his sworn statements to

this Court. In the Court's view, the conduct of ATTM (including its counsel) provides a sufficient basis for serious consideration of the imposition of a sanction, under Federal Rule of Civil Procedure 11(b)(3) and 11(c) and/or the Court's inherent authority to sanction litigation conduct that is done vexatiously or in bad faith. *See generally Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991); *Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 758 (7th Cir. 2005). Such a sanction, were the Court to impose one, could be monetary, to compensate Trujillo and his counsel for the extra work to which they were put due to ATTM's actions, or non-monetary, for example striking ATTM's arbitration defense. The Court will consider these matters in due course. For the time being, however – and even though striking the arbitration defense is a possible sanction – the Court will go on to consider the merits of that defense based on the record as it now appears.

**2.      Availability of contract terms to Trujillo**

What, then, did Trujillo see or have access to before or when he purchased the iPhone? Based on the record now before the Court, at the time he purchased from the Apple store the iPhone that he gave to Dawn Trujillo, Trujillo did not see and did not have access to a paper copy of any documents explaining or referencing ATTM's terms of service, including in particular the arbitration requirement. It has been established beyond peradventure that no such documents were available at the Apple store where Trujillo made the iPhone purchase that forms the basis of his claims in this case.

ATTM also relies on the claimed availability of its terms of service online, that is, via the Internet. This contention has been undermined by the revelation of Berinhout's

misstatements – assuming the argument had merit to begin with, a point the Court need not determine definitively.  As noted earlier, the only version of the terms of service that Trujillo would have seen had he known to search online on or about the date that he purchased the iPhone was an out-of-date version.  But just as importantly for present purposes, ATTM has offered no evidence – none – regarding how Trujillo would have known, before or when he purchased the iPhone, that the service terms were available on the Internet, let alone how to find them.  ATTM has submitted no evidence suggesting that customers in Apple stores (or, for that matter, in ATTM stores) are advised by signs, placards, customer representatives, or in any other way that the company's terms of service can be examined online.  Indeed, ATTM submitted no such evidence even after the Court, in its April 18, 2008 order, specifically called into question the availability of the terms of service online.  *See Trujillo*, 2008 WL 2787711, at *5 ("[O]n the present record, the proposition that Trujillo actually could have found the agreement on-line is nothing more than supposition.  That proposition assumes, without support in the record as it now stands, that someone in Trujillo's position (or perhaps the standard is that of a reasonable consumer) would have been able to figure out how to find it.").

One might suggest that given the ubiquity of computers and access to the Internet, someone in Trujillo's position could have figured out on his own where to look online and what to look for.  Putting aside the sufficiency of that proposition from a legal standpoint to establish access to ATTM's service terms, it utterly fails as a matter of evidence.  Specifically, ATTM has offered no evidence that assists in bridging the gap from the theoretical availability of the obsolete version of the terms of service online

(along with millions of other websites and documents) to a finding that Trujillo actually had access to it: it has offered no evidence that he was aware of the online version, that he was advised of it, or that, as a reasonable consumer, he should have known of it. As the Court stated in its prior ruling, "[c]ourts typically do not rely on facts that are in the air, or that can be figured out by the deciding judge, when those facts have not been presented to the court by the parties as evidence that each side has had the opportunity to address." *Id.* at *5. The only *evidence* before the Court is contained in one of ATTM's supplemental submissions, via the affidavit of Harry Bennett. And it appears from Bennett's affidavit that the terms of service were not easily accessible on ATTM's website, even if one knew to look there in the first place. Rather, one would have had to perform a search using proper terminology. In any event, ATTM has offered no evidence, and no legal authority, that the theoretical availability, via a proper search on the Internet, of an obsolete version of an agreement counts for anything in determining enforceability of a related but different agreement to arbitrate.

For these reasons, the Court finds that ATTM has failed to show that the terms of the contract at issue were known or available to Trujillo before he purchased the iPhone at the Apple store. And ATTM has offered no evidence that Trujillo had any involvement in Dawn Trujillo's activation of service on that iPhone or that he had ever seen her terms of service in connection with her prior dealings with ATTM.

Trujillo did go to an ATTM store, it appears, on July 5, 2007 to have a credit check done so he could activate service on the iPhone Dawn Trujillo had given him as a gift. To the extent ATTM suggests that Trujillo had access to the terms of service at the ATTM store that day, however, the Court rejects the argument. Though store manager

Balce says the terms of service booklet was "available" at the store, as noted earlier this does not suffice to show that Trujillo got it or even that it was available *to him*. For all the Court knows based on the current record, the terms of service were behind a counter somewhere. Despite the several opportunities that ATTM had to supplement its evidentiary showing, it has offered no evidence that the store's practice was to bring the document to the attention of persons who, like Trujillo, came to the store to have a credit check done.

Trujillo did, however, have access to ATTM's terms of service, including the arbitration requirement, when he activated service on the iPhone that Dawn Trujillo gave him as a gift. It is noteworthy, however, that this was several days after he had purchased and, presumably, had given to Dawn Trujillo the iPhone on whose purchase Trujillo bases his claims in this case.

3.      **Arbitrability of Trujillo's claims**

As noted earlier, Trujillo clearly states, in his amended complaint and in his briefing on the motion to compel arbitration, that his claim is based on the iPhone that he purchased, not on the one that he received as a gift from Dawn Trujillo. Though Trujillo gave that iPhone away as a gift, ATTM does not suggest that this prevents him from having standing to sue or from asserting a viable legal claim. Indeed, there is no reason to believe that this state of affairs would have such an effect on Trujillo's suit. The Court does not see why a person who, due to a merchant's deception, purchases as a gift for someone else an item that turns out to be something other than what it was represented to be should be any less able to sue for fraud than a person who makes such a purchase for himself. This state of affairs might affect Trujillo's damages and/or

22

his ability to represent others in a class action, but ATTM makes no contention that it prevents him from suing altogether.

The fact that Trujillo's suit is based on the iPhone he purchased and gave as a gift does, however, have significant implications with regard to ATTM's motion to compel arbitration.  Indeed, were it not for the fortuity that Trujillo later received a different iPhone as a gift and then signed up for service with ATTM, ATTM would not even have a straight-faced argument in favor of arbitration.  Trujillo entered into no agreement with AT&T in connection with his purchase of the iPhone at issue in this case.  Indeed, as the Court has found, he lacked access to ATTM's terms of service prior to, at the time of, or in connection with that purchase, and there is no evidence that he had any idea that ATTM required arbitration of disputes.  A party cannot be compelled to arbitrate a dispute that he has not agreed to arbitrate.  *See, e.g., Int'l Bhd. of Elec. Workers, Local 21 v. Ill. Bell Tel. Co.*, 491 F.3d 685, 687 (7th Cir. 2007) (citing *AT&T Techs., Inc. v. Comm'c'ns Workers of Am.*, 475 U.S. 643, 648 (1986)).  For this reason, if Trujillo had not received an iPhone as a gift and contracted for service with ATTM, there would be no basis to compel arbitration of his claims.

Trujillo did, however, enter into an agreement with ATTM to arbitrate disputes, albeit in connection with his activation of service on a different iPhone from the one whose purchase is the basis of his claims in this lawsuit.  He does not argue that this agreement does not apply to his claims regarding his purchase of the iPhone for Dawn Trujillo.  Rather, he argues that the ATTM agreement cannot be enforced because it is unconscionable.

Under the Federal Arbitration Act, arbitration clauses "shall be valid, irrevocable, and enforceable, save upon  such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The party resisting arbitration bears the burden of showing that the claim at issue is unsuitable for arbitration.  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).  When that party challenges the validity of the agreement to arbitrate, a court applies the relevant state law principles that govern the formation of contracts.  *First Options of Chi. v. Kaplan*, 514 U.S. 938, 944 (1995). General state-law contract defenses such as fraud, duress, or unconscionability may operate to invalidate arbitration agreements, allowing a party to avoid having to arbitrate his dispute.  *Doctor's Assocs. v. Casarotto*, 571 U.S. 681, 687 (1996).

Trujillo asserts that ATTM "has not learned from its mistakes," Pl. Resp. at 2 – a reference to a ruling by the Illinois Supreme Court that held the class-arbitration waiver contained in an earlier version of the service agreement to be unconscionable under Illinois law.  *See Kinkel v. Cingular Wireless LLC*, 223 Ill. 2d 1, 857 N.E.2d 250 (2006). ATTM counters that the arbitration provision contained in the service agreement Trujillo accepted is strongly "pro-consumer" and has more than corrected for the shortcomings the court in *Kinkel* found in the earlier version (although it still contains a class-arbitration waiver).  ATTM also argues that section 2 the FAA, 9 U.S.C. § 2, would expressly preempt Illinois law if its arbitration clause were held unconscionable under that law.  It further argues that the doctrine of conflict preemption leads to this same result.

a. **Unconscionability**

Unconscionability under Illinois law has both procedural and substantive facets; "[a] finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both." *Kinkel*, 223 Ill. 2d at 22, 857 N.E.2d at 263 (citing *Razor v. Hyundai Motor Am.*, 222 Ill. 2d 75, 99, 854 N.E.2d 607, 622 (2006)). Procedural unconscionability exists when a contract provision is so difficult to locate, read, or understand that a party "cannot fairly be said to have been aware he was agreeing to it." *Id.* (quoting *Razor*, 222 Ill. 2d at 100, 854 N.E.2d at 622). Procedural unconscionability analysis takes into account the relative bargaining power of the parties to the agreement and inquires whether there has been "some impropriety during the process of forming the contract depriving a party of a meaningful choice." *Id.* at 23, 854 N.E.2d at 264 (quoting *Frank's Maintenance*, 86 Ill. App. 3d at 989, 408 N.E.2d at 410).

Trujillo contends that procedural unconscionability pervaded the process by which he signed up for ATTM's service. He contends that he had no access to ATTM's service agreement until after the iPhone purchase upon which he bases his claims in this case. Trujillo also contends that ATTM's status as the only licensed provider of wireless service for the iPhone deprived him of real choice. Finally, he contends that the arbitration clause was "crammed into a small print online text box that is so small one can only see a few lines . . . at a time" and was thus "concealed" in a maze of fine print. Pl. Resp. at 14. Therefore, Trujillo asserts, even if he technically had access to the arbitration clause, this should not preclude a finding of procedural unconscionability

because ATTM's use of the text box shows that "a merchant offering a take-it-or-leave-it contract . . . has many ways to hide onerous terms without entirely denying the consumer any access to the provision."  *Id.* at 15.

The Court has found that Trujillo did not have access to the ATTM service agreement prior to or at the time he purchased the iPhone from the Apple store. Rather, the first time that Trujillo saw or reasonably could be considered to have access to the ATTM agreement was when he signed up for service after he received as a gift a different iPhone, the one that Dawn Trujillo had purchased.  Though a straight-faced argument could be made that this contract does not bind Trujillo to arbitrate disputes arising from his purchase of a completely different iPhone, as noted earlier Trujillo does not make that argument.  His belated access to the agreement does, however, directly impact the unconscionability analysis.

Under Illinois law, the unavailability of the ATTM service agreement to Trujillo before he purchased the iPhone is a critical factor in determining the issue of procedural unconscionability.  *See Razor*, 222 Ill. 2d at 100-01, 854 N.E.2d at 623.  In *Razor*, the Illinois Supreme Court concluded that a warranty containing a disclaimer of consequential damages had not been "made available to the plaintiff at or before the time she signed the sale contract for an automobile, because it was contained in an owner's manual in the automobile's glove compartment, "where it was unavailable to the consumer until after she took delivery."  *Id.*  Though the court acknowledged that the waiver was in understandable language and was easy to read – a contention likewise made by ATTM in the present case – these facts "simply do[ ] not matter," the court said, "if the consumer did not have the opportunity to *see* the language before

26

entering into the contract to purchase the car." *Id.* at 101, 854 N.E.2d at 623 (emphasis in original). The waiver was ineffective, the court said, because it was not "provided to the purchaser at or before the time that the purchase occurs." *Id.* at 103, 854 N.E.2d at 624.

As in *Razor*, other circumstances in the present case buttress the conclusion that the circumstances rendered the arbitration requirement and class action waiver procedurally unconscionable. Trujillo presumably could have declined to click on the "agreement" box when he went online to activate service on the iPhone that Dawn Trujillo had given him. By then, however, he had already purchased the iPhone that he gave Dawn as a gift and upon whose purchase he bases his claims in this case. By the time Trujillo first saw or had access to ATTM's service agreement, he could do nothing to unwind the earlier purchase. Based on the information that Trujillo had, it appeared that he would have received something less than 100 cents on the dollar if Dawn's iPhone had been returned: the sales receipt said that only ninety percent of the purchase price would be returned. Though ATTM has now, after the fact, offered evidence that Apple had a practice of waiving the ten percent restocking fee, based on the record before the Court, that practice was nowhere disclosed to Trujillo or, for that matter, to any other purchaser or prospective purchaser.

In *Bess v. DirecTV, Inc.*, 351 Ill. App. 3d 229, 885 N.E.2D 488 (2008), the Illinois Appellate Court considered a situation in which it appeared the agreement governing the terms for television service the plaintiff purchased was not provided to her until after she activated the service. The court ruled that this was insufficient to render the agreement procedurally unconscionable. It noted that although the plaintiff did not

27

receive the agreement until after she ordered the service, it provided that it was not binding until after she read it and continued to receive the service, and it advised her that if she did not accept the agreement, her service would be cancelled immediately and she would not be charged a fee. *Id.* at 239, 885 N.E.2d at 496-97.

The same is not true here. As the Court has noted, by the time Trujillo first saw or had access to the ATTM agreement, he had already purchased, from a completely separate entity (Apple), the iPhone at issue in this case. Unlike in *Bess*, a fee of at least ten percent of the device's purchase price would have been incurred – at least as far as Trujillo knew – had that iPhone been returned. Indeed, it is possible that a higher fee would have been incurred depending on the condition of the iPhone at the time of its return. And based on the rate plan document that ATTM itself submitted, it is likewise possible that the ATTM activation fee that Dawn Trujillo had incurred would have been lost, depending on when the iPhone was actually returned.

In short, the situation in the present case is nothing like *Bess*, in which the plaintiff, had she chosen not to accept the belatedly-produced agreement, would have incurred no expense.

ATTM cites, as did the court in *Bess*, the Seventh Circuit's decision in *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997). In *Hill*, the court addressed the enforceability of an arbitration agreement that was inside a box containing a computer that the plaintiffs had purchased via telephone. Though the court did not discuss the issue of unconscionability in so many works, it found the agreement enforceable despite the fact that the plaintiffs had not seen it before or when they purchased the product.

28

*Hill* does not control the present case.  As in *Bess*, the agreement in *Hill* made it clear that the customer could return the product without penalty (as best as this Court can determine from *Hill*) if he did not accept the agreement's terms.  The same is not true in Trujillo's case.[3]  The court in *Hill* also stated that "because the Hills knew before they ordered the computer that the carton would include *some* important terms, and then did not seek to discover these in advance," it was beside the point whether they would have suffered a financial penalty had they declined to accept the agreement. *Id.* (emphasis in original).  The court went on to state that the plaintiffs could have asked the vendor to send a copy of any agreement before deciding whether to buy it or could have consulted public sources, including the vendor's website, "that may contain this information."  *Id.*  But because the plaintiffs kept the computer, the court said, they accepted the terms of the agreement.

As the Court stated in its April 18, 2008 ruling, it is bound to follow the Seventh Circuit's determination of what Illinois law is, unless there is an intervening and contrary decision from the state's highest court.  *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).  *Razor* is such a decision.  As the Court has noted, the dispositive factor in that case was the unavailability of the agreement to the consumer until after she had purchased the product.  Although it was presumably just as true in *Razor* as in *Hill* that the consumer could have asked in advance for a copy of any

---

[3]  The ATTM terms of service that Trujillo evidently had the opportunity to review when he signed up for service stated that if he did not agree, he could return the iPhone for a refund.  But the receipt from the Apple store for the iPhone he purchased – the device whose purchase is at issue in this case – said this would be less than a full refund, as the Court has noted.

applicable agreement, or could have checked a website, the Illinois Supreme Court did not hint that this was at all significant as a matter of Illinois unconscionability law. Given this significant intervening decision from Illinois' highest court, this Court must rely on *Razor*, to the extent it is contrary to *Hill*, in determining what Illinois law holds in this context.

One other factor leads the Court to consider *Razor*, rather than *Hill*, to be controlling in this case. There is no evidence that Trujillo actually could have gotten the agreement upon which ATTM relies in advance of his purchase of the iPhone from the Apple store. Berinhout, in his most recent affidavit, states that ATTM actually had no understanding with Apple to make ATTM's terms of service available in Apple stores, and ATTM has provided no evidence from anyone with actual knowledge of Apple's practices that the agreement was, in fact available there. In addition, ATTM's own evidence – at least its belatedly-submitted evidence – establishes that the agreement upon which it relies was not available online. And though an earlier, similar agreement might have been findable somewhere within ATTM's website, ATTM has offered no evidence reflecting that Trujillo would have had a clue it was there or, if so aware, could have found it. The Court has a hard time believing that the theoretical availability, under a proverbial rock, of an obsolete version of an agreement not actually shown to the consumer can render it enforceable as a matter of Illinois law – and in fact no case, including *Hill*, so holds.

ATTM suggests that a holding that the unavailability of its agreement renders it unenforceable against Trujillo will produce severe consequences and make it unfairly hard for it and other mass-marketers to do business. Not so. It would have been

relatively simple for ATTM to make its terms of service *actually* available in Apple stores, given the companies' exclusive arrangement regarding the iPhone – indeed, Berinhout initially thought, albeit incorrectly, that such an understanding existed between the two companies.  Or it could have provided the agreement as an insert within the iPhone's package, which under *Hill* and *Bess* likely would have made it enforceable, at least so long as the consumer suffered no financial penalty if he chose not to accept the agreement.  Or ATTM and Apple could have made, and disclosed to consumers, a policy of returning the entirety of the iPhone's purchase price to the consumer should he choose not to accept ATTM's terms.  In short, the parade of supposed horribles cited by ATTM – a relatively short parade to begin with – cannot affect the outcome of the present motion.

For these reasons, the Court concludes that Trujillo has established, in the particular circumstances of his case, the procedural unconscionability – and thus the unenforceability – of ATTM's arbitration requirement.  In view of the Court's conclusion on the claim of procedural unconscionability, it need not address Trujillo's claim of substantive unconscionability.  Though, as ATTM argues, a "degree" of procedural unconscionability "may not be sufficient to render [an agreement] unenforceable," *Wigginton v. Dell*, 382 Ill. App. 3d 1189, 890 N.E.2d 541, 547 (2008), this is a case in which the finding of procedural unconscionability concerns such a basic matter – the unavailability of the agreement to the consumer at the relevant time – that it is enough under *Razor* to render the agreement unenforceable, particularly in view of the financial penalty that Trujillo would have suffered had he declined to agree to ATTM's terms once he saw them.

31

### b.     Preemption

Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal law may preempt state law in one of three ways:  "expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 487 (7th Cir. 2005) (quoting *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002)).  ATTM argues that the doctrines of express and conflict (or implied) preemption operate in this case to shield its arbitration clause from a finding of unconscionability under Illinois law.

ATTM's argument, however, focuses entirely on the claim of substantive unconscionability.  *See* ATTM Mem. at 11-15; ATTM Reply at 13-15 (both focusing on substantive unconscionability generally and the particulars of the class action waiver in particular).  Because the Court has not denied ATTM's motion to compel arbitration on that basis, and because the Court has relied not on any doctrine of Illinois law that targets arbitration agreements for special treatment but rather on a rule that applies to contracts generally, ATTM's preemption argument is effectively moot.

### Conclusion

For the reasons stated above, the Court denies defendant AT&T Mobility LLC's motion to compel arbitration and dismiss action [docket no. 36].  The case is set for a status hearing on September 29, 2008 at 9:30 a.m. to address further the sanctions issue discussed earlier in this decision.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  September 22, 2008